J. C. KIRKPATRICK, *et al*, v. THE STATE OF KANSAS, *ex rel.*

McKEE.

*Error from Douglas County.*

*Case Decided May 15th, 1868.*

1. MUNICIPAL CORPORATIONS: BOUNDARIES.—The sixth section of article 5, of the "second class city" act of February 23d, 1867, [*L.* '67, *p.* 107] is intended to enable cities incorporated under the provisions of that act, to annex such unorganized territory lying adjacent, as may be subdivided into town lots, and not organized territory.

2. NORTH LAWRENCE: INCORPORATION OF.—The territory known as North Lawrence was not unorganized territory, but had a corporate existence under the provisions of the "act providing for the incorporation of towns and villages," approved February 1, 1859, [*Comp. L., p.* 398.]

3. ID.: *Defacto* CORPORATION.—Whether that organization was in all respects strictly legal or not in its inception, was not for the authorities of the adjacent city of Lawrence to determine. If a municipal corporation existed and exercised governmental powers, the state, and not a rival corporation, must determine the question of its legality.

4. STATUTORY CONSTRUCTION: TOWN AND VILLAGE ACT.—But the town and village act of 1869 was not in conflict with the organic act, nor was it repealed by implication by the state constitution. It is still subsisting and valid.

The action brought in the court below against the plaintiffs in error was in the nature of *quo warranto*, to determine whether the said plaintiffs in error were legally entitled to hold the office of councilmen of the fourth ward of the city of Lawrence, situated in Douglas county. They claimed to have been elected such officers of said ward, which ward was erected out of territory claimed to have been annexed to the city lying north of the Kansas river opposite. The facts are substantially as follows:

From the 23d day of February, 1867, the city of Lawrence was a municipal corporation, organized under an act of the legislature, approved on that day; was situated on the south side of the Kansas river, Douglas county, with its northern boundary line, in the centre of that stream; that

VOL. V.—43.

the land described in the information, lies north of the city of Lawrence, across said river, directly opposite. The north half of the river at this point is about 350 feet wide, on an average.

On the 26th day of February, 1866, said territory had been, by the county commissioners, made a part of Wakarusa township; had been surveyed into town lots, and the plat of the same duly acknowledged and filed according to law. The condition of the record of the proceeding to incorporate the town of "Jefferson," as designated in the petition, or "North Lawrence," as designated in the order of incorporation, left some questions as to whether the proceedings were by the probate court or before the judge thereof, and there was some conflicting proof as to whether there were the requisite number of names on the petition asking the incorporation. The board of trustees of the "town" so organized proceeded to business, appointed officers, and an incorporation *de facto* existed at the time that the act concerning second class cities of February 27, 1867, went into operation, when an ordinance of the "town" was passed organizing under that act as the "City of Douglas," and, under that organization, a city *de facto* existed with its officers.

An information in the nature of a writ of *quo warranto* was brought to inquire by what right the said officers of the City of Douglas held their offices respectively, and the said officers were ousted by the judgment of the court, May 19, 1867.

Immediately after this decision a petition was introduced into the council of the city of Lawrence praying that the territory in question be annexed to the city of Lawrence as the fourth ward thereof; an ordinance of the city of Lawrence was passed, approved January 12th, 1866, annexing the territory as prayed, as adjacent platted territory, and an election was held at which the plaintiffs in error were duly returned as elected councilmen of said fourth ward of said city of Lawrence as aforesaid.

. The district court rendered judgment against the officers.

The following opinion was filed in the court below, January 8, 1868:

VALENTINE, J.

This is an information in the nature of *quo warranto*, ostensibly to inquire by what authority the respondents, Kirkpatrick and Mason, assume to exercise the powers of councilmen for the city of Lawrence, but really to determine the *status* of North Lawrence, whether it is, itself, a distinct and independent city, or whether it is only the fourth ward of the city of Lawrence, or whether it is unorganized territory, not under the control of any municipal corporation.

It is admitted by all parties that the territory of North Lawrence was, on the 26th day of February, 1866, unorganized, but it is claimed by the relator McKee, that on the next day, February 27, the town was duly organized as a municipal corporation under the act of February 1, 1859, (*Comp. Laws*, 398) and that it has since that time remained a distinct municipality.

The first question to determine is, whether the act of February 1st, 1859, was, on the 27th of February, 1866, a valid and existing law; and involved in this question are these other questions:

1. Is that act in contravention of the organic act, or in other words, was it a valid law at the time of its passage?

2. Is it in contravention of the state constitution, or in other words, if it was valid when it was passed, did the constitution, on taking effect, repeal it?

3. If not repealed by the constitution, has it been repealed by the state legislature?

The respondents claim that it is in contravention of the organic act, because the legislature had no authority to give to probate courts the power of organizing municipal corporations:

1. Because that power is a legislative power, which

cannot be delegated by the legislature to any other tribunal, but can be exercised by the legislature alone.

2. Because that power is a judicial power which could be conferred only upon the district courts of the territory and not upon the probate courts.

It is true that in this country the power to organize municipal corporations must originate with the legislature, and in that sense the power is legislative, but if the legislature must necessarily act specifically upon each corporation, then in this state where the legislature is prohibited (*Sec.* 1, *Art.* 12, *State Const.*) from thus acting, we can have no corporations at all. We think the legislature may through the intervention of probate courts, or otherwise by general laws, grant corporations, and while the granting of corporations is ordinarily a proper subject of legislation, yet it seems that it is not necessarily so, for they have seldom been granted in any country by the legislative branch of the government, and in England they have usually been granted by the King's letters patent only. 2 *Blackstone Com.*, 473.

Supposing the power of organizing a corporation, or rather of judicially determining when a corporation is organized, is a judicial power, then is the act void for that reason? Section twenty-seven of the organic act vested all the judicial power of the territory in a supreme court, dis-trict courts, probate courts and justices of the peace, and while it defines to some extent the powers of the several courts, yet in a general provision it provides that their jurisdiction "*shall be as limited by law.*" And as the organic act nowhere prohibits the probate courts from exercising such power, and as such power is nowhere specifically given to any other court, it would seem that this general provision would give the legislature full authority to confer it upon probate courts. It is true that the territorial supreme court in the case of Locknane v. Martin, decided that because the organic act gave to the district courts both common law and chancery jurisdiction that therefore the probate courts could

not exercise such jurisdiction. Admitting that decision to be correct, yet it does not decide this case, for the act of organizing corporations under the act of February 1, 1859, is not a common law or chancery proceeding, but is a *special statutory proceeding*, unknown to the courts of common law or courts of chancery. This must have been the opinion of the legislature, for they passed this act long after that decision was made, and had the full benefit of the decision.

The same questions arise with respect to this act under the constitution as under the organic act, and nearly the same arguments for both sides of the question apply. Both the constitution and the organic act, in defining the powers of the different judicial tribunals, do not define particularly their jurisdiction, but leave a vast amount of judicial power to be placed where the legislature shall see fit.

The state constitution, section one, article three, vests all the judicial power of the state in a supreme court, district courts, probate courts, justices of the peace, *"and such other courts, inferior to the supreme court, as may be provided by law."* Under this section we suppose that the probate judge may be made a judge of a criminal court, as has been done in Leavenworth county, or he may be made a judge of any other special jurisdiction or proceeding not prohibited by the constitution, under the name of a probate court, or under any other name that the legislature may see fit to impose upon it. If the act was a valid law when the state was admitted, we think section four of the schedule to the constitution, continued it in force.

It is also contended that the act has been repealed by section seven, of the act conferring certain jurisdiction upon probate courts. [*Comp. L.*, 466.] The repeal at most can only be by implication, which is never favored in law. [1 *Kent's. Com.*, 467 ; *Smith Stat. and Const. L.*, 879.] But we think there is no repeal, even by implication, as the two acts are not inconsistent with each other in any particular. This act has been on the statute book nearly nine years. Two

different territorial legislatures and seven different state legislatures have been in session since its passage. Many important rights and long approved remedies have accrued under it, which is strong evidence in favor of its validity.

Supposing the act to have been a valid law on the 27th of February, 1866, the next question is whether North Lawrence was legally organized under it. We think that the records of the probate court of Douglas county upon their face show that North Lawrence was legally organized, but upon the introduction of these records several questions arise :

1. Can we go behind the records of the probate court and impeach them ? and if so, to what extent ?

The probate court under section eight article three, of the constitution, is a court of record, but of special and limited jurisdiction ; and for a special proceeding of this kind, it is doubtful even whether it is a court of record. If the probate judge in this proceeding acted only as a ministerial officer, then we suppose there is no doubt but that we could inquire into all his proceedings, collaterally as well as directly, and receive evidence *aliunde* to impeach the record ; but it seems to be admitted, and even claimed by both parties, that the act of the probate judge in this proceeding was a judicial act, in contradistinction to a ministerial act. If it was a judicial act, (and we suppose it was,) then as it was the act of a court of special and limited jurisdiction, we suppose we can go behind the record far enough to see whether the probate court had jurisdiction of the subject matter or not, but no further. We suppose that the record is *prima facie* evidence only of the facts it recites, showing that the court had jurisdiction, but is conclusive as to all matters or proceedings after the court had once obtained jurisdiction.

2. It is claimed by the respondents that although the record shows that the proceeding were had before the probate court, yet that they were in fact not before the probate

court, but were before the *judge* at *chambers*.    We think, however, the evidence clearly shows that they were before the probate court as a *court*.

· 3.    Again, it is' claimed that if the proceedings were before the court, that the court had no jurisdiction of the subject matter because there was not a sufficient petition presented.

There were 143 persons who petitioned for the incorporation, out of about 1,200 inhabitants, of whom 248 were males over twenty-one and under fifty years of age, and eleven were males over fifty years of age, and eleven were women who were tax payers.    There were not two-thirds of all the inhabitants who. petitioned, neither were there two-thirds of all the inhabitants who paid taxes and worked the roads that petitioned; but there were two-thirds of all who paid taxes, not including those who were liable to work on the roads but paid no taxes, who signed said petition.

1.    It is contended by the respondents that the court could not take jurisdiction because there were not two-thirds of all the inhabitants, male and female, white and black, and men, women and children, who signed the petition.    We cannot think that section one of the act [*Comp. L.*, 398] can bear any such construction, when it says that if the court shall be satisfied that two thirds of the *taxable* inhabitants have signed the petition, it shall declare the town or village incorporated; and we think it would be about as democratic to allow the *tax payers* of a town to incorporate it as it would be to allow six men, or even a majority of the six— outsiders, if we may be allowed the expression—non-residents having .no interest in the town, but being councilmen of a foreign corporation, to absorb it into their own corporation and.give laws to a town of 2,000 inhabitants without the legal consent of one of them. ·

2.    But it is further contended that two-thirds of the *taxable* inhabitants did not sign the petition, and claimed that all male persons over twenty-one and under fifty years

of age are tax payers because they are each liable to work
on the roads two days. But we think that to work on the
roads is no more the payment of a tax than training in the
militia. [*Overseer of the Poor of Amenia v. Overseers of Stan-
ford*, 6 *Johnson's R.*, 92.] The service in each may be com-
muted in certain cases and payment received in money; but
it can hardly be supposed that the legislature intended to
include either of those classes by the words *taxable inhab-
itants.* Neither the two days work on the roads nor the
commutation money is ever charged against the individual
on the tax list.

3. It is also suggested, but we think hardly relied on
by respondents, that as the name of the township in which
North Lawrence was situated was *Wakarusa*, that the peti-
tion was void, and could give the court no jurisdiction
because it asked to have the new corporation named *Jeffer-
son* instead of Wakarusa, the name of the township.

It does not seem to be questioned but that the territory
occupied by North Lawrence was a town or village within
the meaning of the act, and had a right to petition. We
suppose the probate court had sufficient jurisdiction to
organize a valid corporation. But it is claimed that if the
probate court had jurisdiction, still its proceedings are void
because it organized the corporation under the name of
*North Lawrence* instead of *Jefferson*, as asked for by the peti-
tioners, or *Wakarusa*, the name of the township. It is not
very clear under the act who should give the name to the
new corporation. But suppose the court erred, still its pro-
ceedings, after it obtained jurisdiction, are valid as against
all the world until they are reversed, and they cannot be
attacked in a collateral proceeding like this.

It is evident that the town of North Lawrence accepted
the organization, elected officers under it, and were governed
by it for about fourteen months before any question of its
validity arose. From the foregoing reasons we infer that
the said town of North Lawrence once had a valid corporate

existence, and still has, unless its corporate existence has been dissolved, which we will now proceed to consider.

There are only four ways of dissolving a municipal corporation. 2 *Kent Com.*, 305, *et seq.*:

1. By the loss of all its members or of an intregal part.

2. By the surrender and acceptance of its franchises.

3. By forfeiture of its charter for non-user or misuser of its franchises.

4. By statute.

It is not contended that it has been dissolved by a loss of all its members, or of an intregal part, for it has more members now than when first organized. Neither is it contended that it has been dissolved by a surrender and acceptance of its franchises, the manner of which is prescribed by statute. §§ 26 *and* 27, *Comp. L.*, 403.

But it is claimed that the corporation has been dissolved by non-user or misuser of its franchises, and the non-user complained of is that the corporation has failed to elect officers, and the misuser is that they have attempted illegally to change their organization from that of a town to that of a city. Suppose they did fail, as the evidence shows they did, on the first Monday of last April, to elect officers as provided by section three of the act of February 1st, 1859, or section ten of the act of March 2d, 1867, that would be no ground of forfeiture of their charter; but their old officers would hold over under section four of the first act, or section twelve of the second act, and remain in office until their successors were duly elected and qualified. It is true that section twelve of the second act uses the word "councilmen" instead of the word "trustees," but there can be no doubt, taking the whole act together, but that the legislature intended by the word "councilmen" in that section to include all officers who performed the duties of councilmen.

And suppose the people of North Lawrence have made several illegal attempts to elect officers and organize as a city under the act of 1867, [*Laws of* 1867, 107, *et seq.*,] and

never legally organized or elected officers, still it would not
destroy the corporation. The officers would not be officers
*de jure*, and might be ousted, as some of them have been,
and as others may be. [The case of the State, *ex rel.*, Bruce
v. Tallman, *et al.*, was instituted for that purpose.] Even if
the corporation had no legal officers, or no officers at all, yet
the corporation might still not be dissolved, [2 *Kent's Com.*,
310;] for, if these acts of non-user and misuser were suffi-
cient in law to dissolve the corporation, still the corporation
would not be actually dissolved, but must be deemed valid
and subsisting until a judgment of forfeiture shall be pro-
nounced against the corporation in a *direct* proceeding, insti-
tuted for that purpose, and not in a collateral proceeding of
this kind. 2 *Kent Com.*, 312, 313.

It is claimed that the corporation has been virtually dis-
solved by statute—not directly but indirectly. It is claimed
that by sections one and three of the supplemental act,
[*Laws of* 1867, 128,] the corporation could not remain
under their old organization unless at an election held
within three months they should vote to do so, which vote
never was had, and therefore that their old organization is
dissolved; and it is claimed that under section one of the
supplemental act that in order to be a corporation under the
new act of 1867, they must *organize* under it, which they
claim has never been done, and that therefore they have
effected no new organization, and hence their entire corpo-
rate existence is totally dissolved.

We think, however, that as they have had no vote to
remain under the old act within the three months, but actu-
ally voted to organize under the new act, that at the end of
the three months, to-wit: June 8th, 1867, they became a city,
governed by the provisions of the new act, and that it was
their duty to immediately organize under it, as it is doubtful
whether the officers under the old organization, after that
time, could do any valid act except to so organize. We do
not propose to discuss the question in this case whether they

have -effected a legal organization or not,. for we think it makes no difference in this case. It has been suggested by counsel for respondent that if *municipal* corporations come under this new act without any action on their part, that therefore the act will fall as a mantle over counties and townships, and such other *quasi* corporations. But such does not necessarily follow, for such corporations are seldom if ever in common language, or in the books called *municipal* corporations; and taking the whole act together, it clearly shows that it was not intended for counties, townships, etc. Section one, of the new act provides that "all cities or munipal corporations of the State of Kansas of the second class, containing more than one thousand and less than fifteen thousand inhabitants, *shall be governed* by the provisions of this act;" and section one of the suplemental act provides, that they *shall* organize and *be governed* by "the new act, *unless* in three months they *vote* to be ·governed by the old act." We think this is conclusive. By passing from a town to a city, the inhabitants thereof do not become a new corporation. They are the same old corporation that was ´organized February 27th, 1867, in a new dress. They loose no rights, and avoid no liabilities that accrued before they became a city.

It is also claimed that the corporation has been dissolved by annexing North Lawrence to the city of Lawrence under section six, article five of the new act, and ordinance No. 71, of the city council of Lawrence. It is claimed that under section six, wherever two municipal corporations exist adjacent to each other, that one may annex or absorb the other; for instance, .that Lawrence might absorb North Lawrence, or *vice versa*, North Lawrence might absorb Lawrence, and the proceedings of the city which took action first would be valid; but if each should pass an ordinance absorbing the other at the same time, we are not told what would be the result. And neither are we told in any case what would become of the property,

or who would pay the debts or settle the estate of the spoli-
ated and defunct corporation; and there is no provision by
statute for any such case.  We think that section six was
not intended by the legislature to apply to the annexing of
other corporations, and therefore that North Lawrence was
not annexed to the city of Lawrence, because the city coun-
cil of Lawrence had no power to do so.

There are other questions arising in this case which we
do not think necessary to decide.

1.   It is claimed by the relator that the statute of 1867,
is a *remedial* statute, intended to apply to municipal corpora-
tions *de facto,* as well as to municipal corporations *de jure,*
and that it should be liberally construed for the purpose
of accomplishing its object; that under the decision of the
Supreme Court, rendered just before the act was passed, in
the case of the city of Atchison v. Bartholow, [4 *Kas.*, 123,]
there were many of the supposed municipal corporations of
the state that had no actual legal corporate existence, and
that this act was passed for their benefit; and, that even if
North Lawrence was not a valid corporation when the act
was passed, yet, as they in fact were actually exercising the
powers of a corporation, that the act applied to them and
they became a valid corporation under it, and that their
corporate existence could not be subsequently disturbed by a
neighboring city.

2.   It is also claimed that even if North Lawrence was
unorganized territory, unoccupied by any other municipal
corporation, that still the city of Lawrence could not annex
it because:

*First.*  It is not *adjacent* territory and here the whole
doctrine of the rights of riparian proprietors is discussed.  It
appears that the Kansas river intervenes between the two
cities.  And it is claimed for the relator that the stream was
never surveyed or sold by the government of the United
States, but that the stream was meandered and the land
only to the bank of the river was surveyed and sold, and

that the title to the bed of the river is still in the United States, and forms no part of either Lawrence or North Lawrence, as the government never united with the proprietors in making it a part of either city. But on the other hand it is claimed that the riparian proprietors.on each side own to the middle of the river, and that the territory is *adjacent*.

*Second.* It is also claimed that Lawrence never got "the consent in writing of the owners of a majority of the whole number of acres owned by residents of Kansas in the territory proposed to be added," which is admitted by the respondents, but they claim that there was no necessity for such consent as all the territory claimed to have been annexed was "sub-divided into town lots;" and here, again, arises a question as to the river bed, and also the question as to whether twenty acre tracts of land, surveyed and platted as a part of North Lawrence or its additions, are *town lots* within the meaning of the act.

*Third.* The last thing that the relator does in this case is to call our attention to all the acts pertaining to the city of Lawrence, and claiming that if North Lawrence is not a valid corporation, that neither is the city of Lawrence, and therefore the city of Lawrence could not legally annex other territory.

There are questions raised as to the regularity of the election of respondents, as to time, registry, etc., and these questions we would naturally have examined first, but counsel on both sides desired that we should decide the question as to whether North Lawrence was a valid corporation or not. So we have considered all other questions as of minor importance and have decided that question, and the questions necessarily involved in it only.

Our decision is that North Lawrence is a valid municipal corporation, and hence that the respondents are assuming to exercise the powers of councilmen for the fourth ward of the city of Lawrence without authority.

*Thacher & Banks*, for plaintiff in error.

*W. Shannon and N. Hoyzradt*, for defendants in error.

*For plaintiff in error*, it was submitted :

1.   This proceeding is practically a trial of the rights to the respective offices.  10 *Mass.*, 301 ; 6 *Am. Com. L.*, 492 ; 15 *Johns.*, 386 ; 24 *N. Y.*, 86 ; 15 *id.*, 532 ; 4 *Cow.*, 380.

2.   The determination of the right to an office, necessarily involves the question of the existence of the office, and the legality of the organization providing it.  15 *N. Y.*, 532 ; 24 *id.*, 86 ; 25 *Vt.*, 433.

3.   The legislature exclusively controls the organization of cities.  *Angel Corp.*, 21 *and* 22, § 31, *notes* 1, 2, *p.* 54, § 71 ; 8 *Iowa*, 86 ; 16 *id.*, 273 ; 12 *Ill.*, 1 ; 4 *Ohio*, 432 ; 4 *Wheat.*, 518 ; 2 *Kent's Com.*, 331 ; 9 *Mo.*, 507.

4.   This includes power over municipal extention and boundaries, and this without the consent of the inhabitants. 4 *Comyn's Dig.*, 255 ; *Angel*, § 31 ;  8 *Iowa*, 82 ; 16 *id.*, 271 ; 13 *Mo.*, 412 ; *Sedgw. Const. L.*, 675.

5.   This latter exercise of power may be delegated to the officers of the municipalities.  8 *Ohio St.*, 289 ; 11 *id.*, 99– 100 ; 9 *Ben. Mon.*, 332 ; *Angel*, 57, §§ 74, 75, *p.* 63, *note* 3 ; 1 *Kyd*, 50 ; 1 *Mo.*, 5.

6.   The territory lying adjacent could be annexed by the city of Lawrence, under article five, section six, of the laws of 1867, page 126.

7.   The intervention of even a navigable stream does not destroy the contiguity of territory for purposes of annexation.  *Blanchard v. Bissell*, 11 *Ohio St.*, 96–8.

8.   The power granted to the council to annex, is broad and full, and includes all territory whether organized or not.  Annexation is always accompanied with absorption of other governmental functions.  *Rex v. Amery*, 2 *Brown's P. C.* ; 1 *Harrison, Dig.* 1671 ; 5 *Com. Dig.* 3.

9.   The territory being platted includes it within the

proviso of said section six, to annex which the unconditional power is given.

10. The territory annexed was not legally organized as a city or town. The town, North Lawrence, was never organized as a town, but remained a part of the surrounding township. A municipal corporation is a creature of law, and cannot exist except by virtue of the sovereign power. *Angel Corp.*, §§ 1, 2, 3, 5, *p.* 49, § 66; 1 *Browns Civ. L.*, 101–2; 2 *Kent Com.*, 331.

11. Illegally organized corporations were not intended to be covered by the act of 1867. Corporations *de facto* are now unrecognized by the law. *Angel*, §§ 18, 19, 66, 67, 68, 69, 71; 2 *Kent Com.*, 331, 334.

12. The action in attempting to erect the town of North Lawrence was absolutely void because it was not done by the probate court as provided by law. The judge had no jurisdiction. The petition was not sufficient. It being a statutory proceeding, jurisdiction should appear affirmatively. *Sedgw. Stat Constr.*, 347.

13. The statutory proceedings of both courts of limited jurisdiction, and of administrative bodies may be inquired into collaterally. 1 *Chitty· Pl.*, 210, 211; 1 *East.*, 64; 8 *id.*, 394; 12 *Ohio*, 272.

14. It was as much a colateral inquiry, the determining whether the fourth ward of the city of Lawrence was duly made a part of the city, as to inquire whether the territory in question had been organized as a town under the act of 1867.

*N. Hoyzradt, for defendants in error*, maintained.

1. There was some evidence of a corporation *de facto* existing over the territory in question. User is some evidence thereof, enough to support the decision below. *Angel on Corp.*, § 635; 5 *N. H.*, 370; 4 *Denio*, 392; 3 *Sandf.*, 161; 3 *id.*, 629; 17 *Barb.*, 378; 20 *Ill.*, 200.

2. The council of the city of Lawrence had no power

to dissolve corporations. It had no jurisdiction to inquire into the legality of the organization of North Lawrence.

*By the Court,* BAILEY, J.

The judgment of the court below affirmed.